# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### May 19, 2009 Session

## STATE OF TENNESSEE DEPARTMENT OF CHILDREN'S SERVICES v. MARLOW WILLIAMS, ET AL.

### Direct Appeal from the Chancery Court for Shelby County
### No. CH-06-0248-2    Arnold B. Goldin, Chancellor

---

### No. W2008-02001-COA-R3-PT - Filed July 28, 2009

---

This is a termination of parental rights case. Father/Appellant appeals the termination of his parental rights to the minor child at issue in this case. Finding that the grounds of abandonment, unwillingness to assume custody, and failure to establish paternity are not established by clear and convincing evidence in the record, we reverse in part, affirm in part and dismiss.

### Tenn. R. App. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in Part, Affirmed in Part and Dismissed

J. STEVEN STAFFORD, J., delivered the opinion of the court, in which DAVID R. FARMER, J., joined and HOLLY M. KIRBY, J., filed a dissenting opinion.

W. Lewis Jenkins, Jr., Dyersburg, TN, for the Appellant, Marlow Williams.

Robert E. Cooper, Jr., Attorney General and Reporter, Amy T. McConnell, Assistant Attorney General, Nashville, TN, for the Appellee, Tennessee Department of Children's Services.

### OPINION

On February 7, 2006, the State of Tennessee Department of Children's Services ("DCS") filed a petition in Shelby County Chancery Court to terminate the parental rights of Auntwinean Lakesha Smith, Melvin Dewaine Sanders, Marlow Williams, and unknown fathers of four children born to Ms. Smith. This appeal is limited to the termination of the parental rights of Marlow Williams to the minor child M.L.E.S. (dob 7-13-98).[1]

---

[1] We note that Mr. Williams has been represented by different court-appointed attorneys in both the trial and appeal of this case.

The record indicates that the children were initially removed from Ms. Smith's custody in 1999 by the Juvenile Court of St. Paul, Minnesota. While residing in Minnesota, Ms. Smith was charged with two counts of malicious punishment of a child. By 2002, however, Ms. Smith had relocated to Memphis, despite the fact that an active warrant was out for her arrest on the above charges. On February 21, 2002, Allen Williams, father of Marlow Williams, petitioned the Shelby County Juvenile Court for custody of M.L.E.S. On the same day, the juvenile court issued a protective custody order, placing temporary custody of M.L.E.S. with Allen Williams. On April 12, 2002, temporary custody and guardianship of the minor children was given to Angela Goodlow, a non-relative (presumably this change was made in an effort to keep the children together as Mr. Allen Williams only wished to take custody of M.L.E.S.). By order of May 17, 2002, Allen Williams was given visitation privileges with M.L.E.S. pending further orders of the court. By order of August 23, 2002, custody and guardianship of the children was placed with Ms. Goodlow.

On March 22, 2006, Marlow Williams filed a letter with the juvenile court expressing his "consent to being the biological father of [M.L.E.S.]." Mr. Williams explained that his name did not appear on the birth certificate because he was incarcerated at the time of the child's birth. He also indicated that he wished to reserve his rights as the child's biological father. In a second letter dated April 1, 2006, Mr. Williams expressed his desire to prove paternity so that his father could pursue custody. He also explained that he was presently incarcerated in Boston, Massachusetts. On April 10, 2006, Allen Williams petitioned the court to modify its custody order to grant custody and guardianship of M.L.E.S. to him. By order of April 20, 2006, the juvenile court ordered Marlow Williams to submit to DNA testing and granted Allen Williams visitation with M.L.E.S. The DNA test results indicate that Marlow Williams is the biological father of M.L.E.S.; however, we find no adjudication of paternity in the record. By order of June 21, 2007, the juvenile court dismissed Allen Williams's petition to modify its previous order, and the children were ordered to remain in foster care. Although these juvenile court orders are factually relevant to this case, our inquiry is limited to the actions taken by the chancery court in the termination proceedings.

In its February 7, 2006 petition to terminate parental rights, DCS alleges, in relevant part, that Marlow Williams has abandoned the child by failing to either visit or support the child for the four month period immediately preceding the filing of the petition. The petition further alleges that Mr. Williams failed to file a petition to establish paternity of the child within thirty days after notice of alleged paternity by the mother. DCS initially conducted service by publication. On July 27, 2006, DCS filed a motion for default judgment against Mr. Williams. In response, the chancery court appointed a guardian ad litem. A second motion for default judgment was filed on or about October 2, 2006. While this second motion was pending, a foster care review hearing was conducted by the juvenile court. Marlow Williams appeared at this hearing, stating that he wished to contest the termination of his parental rights. The guardian ad litem then moved the court to appoint an attorney for Mr. Williams, and the court granted the motion. On March 20, 2007, the trial court entered default judgments against Ms. Smith, Mr. Sanders, and unknown father, but not against Mr. Williams. On or about April 16, 2007, Mr. Williams filed an answer to the petition to terminate parental rights, in which he denies the material allegations contained therein. On the same day, Mr.

Williams also filed an affidavit acknowledging paternity of M.L.E.S. The test confirming Mr. Williams's paternity was also filed in the chancery court.

In March 2008, Allen Williams, filed a motion to intervene in the chancery court proceedings and a petition requesting custody of M.L.E.S. The court heard both the motion and petition on May 2, 2008. By order of May 15, 2008, the trial court denied Allen Williams's petition, finding that he had no standing to petition for custody or right to intervene in the termination proceeding. In this order, the court also notes that, pursuant to Tenn. Code Ann. § 36-1-113(9)(A), Marlow Williams "has failed to establish paternity of the child, though he knew as early as February 21, 2002, and possibly from the time the mother was pregnant, that he was the father of [M.L.E.S.]."

The termination petition was heard by the trial court on two days: February 27, 2008 and May 19, 2008. The record, however, indicates that Marlow Williams was only present for the second day of the proceedings. On June 3, 2008, the trial court entered an order terminating the parental rights of Marlow Williams to M.L.E.S. The order reads, in relevant part, as follows:

> 21. Pursuant to T.C.A. § 36-1-113(g)(1), and as defined in T.C.A. §36-1-102(1)(A)...Marlow Williams...[has] abandoned the child[] in that, for a period of four (4) consecutive months immediately preceding the filing of the Petition for Termination of Parental Rights, [he] failed to make any contribution whatsoever toward the support of the child[], despite being able-bodied and capable of being employed....
>
> 22. Pursuant to T.C.A. §36-1-113(9)(A) et seq. ... Marlow Williams...[has] failed to file a petition to establish paternity of the children within thirty (30) days after notice of alleged paternity by the children's mother. Daphne Jason testified that according to Marlow Williams' letter dated March 22, 2006, he knew as early as when the child, [M.L.E.S.], was born that he was her father. Marlow Williams confirmed this fact during his testimony on May 19, 2008. Furthermore, Mr. Williams also testified that in the months that he was not incarcerated he never filed a petition to establish paternity of the child....
>
> *                    *                    *
>
> 24. Pursuant to and as defined in T.C.A. §36-1-113(9)(A)(iv)... Marlow Williams...[has] failed to manifest an ability and willingness to assume legal and physical custody of the minor child[]. Awarding legal and physical custody of the children to [Mr. Williams] would pose a risk of substantial harm to the physical or psychological welfare of the children.

25. Pursuant to T.C.A. §36-1-113(i)(1)-(7), termination of parental rights is in the best interest of said child[] in that Respondents have failed to make such an adjustment of circumstances, conduct, or conditions as to make it safe and in the child['s] best interest to be in their homes, despite reasonable efforts by available social service agencies for such duration of time that lasting adjustment does not appear reasonably possible; a meaningful relationship with the child[] and Respondent[] [has] not otherwise been established; a change of caretakers and physical environment is likely to have a traumatic effect on the child['s] emotional and physical condition; Respondent[] [has] failed to support the children....the Respondent[] [has] abandoned the child[] for more that four (4 consecutive months preceding the filing of the Petition; Marlow Williams...[has] failed to establish paternity of the child[] and manifest an ability or willingness to assume legal and physical custody of the child[]; and the physical environments of Respondent['s] home[] [is] unknown to Petitioner....

In terminating Mr. Williams's parental rights to M.L.E.S., the court specifically notes in its order that it does not find abandonment by willful failure to visit under Tenn. Code Ann. §36-1-113. Mr. Williams appeals the termination of his parental rights, and raises several related issues in his brief:[2] specifically, whether the record supports, by clear and convincing evidence, the trial court's finding that grounds for termination of Mr. Williams's parental rights to M.L.E.S. were met, and, if so, whether termination of those rights is in the best interest of M.L.E.S.

We first note that Mr. Williams was incarcerated when the termination petition was filed and throughout the proceedings in the trial court. Although Mr. Williams was present for the second day of the hearing, the trial court did not rehear the issues and evidence considered in his absence. Tenn. Code Ann. § 36-1-113(f) sets forth the rights of incarcerated parents to notice and participation in termination proceedings:

> (f) Before terminating the rights of any parent or guardian who is incarcerated or who was incarcerated at the time of an action or proceeding is initiated, it must be affirmatively shown to the court that such incarcerated parent or guardian received actual notice of the following:

---

[2] Mr. Williams raises two issues with respect to his father, who is not a party on appeal. First, he challenges the trial court's decision to exclude his father as a witness. Second, he asserts that the trial court erred in denying his father's motion to intervene. Because we ultimately decide this case in Mr. William's favor on other grounds, we do not address the first evidentiary issue. Likewise, we do not address the intervention issue, as Mr. Williams's father is not a party on appeal.

-4-

(1) The time and place of the hearing to terminate parental rights;

(2) That the hearing will determine whether the rights of the incarcerated parent or guardian should be terminated;

(3) That the incarcerated parent or guardian has the right to participate in the hearing and contest the allegation that the rights of the incarcerated parent or guardian should be terminated, and, at the discretion of the court, such participation may be achieved through personal appearance, teleconference, telecommunication or other means deemed by the court to be appropriate under the circumstances;

(4) That if the incarcerated parent or guardian wishes to participate in the hearing and contest the allegation, such parent or guardian:

> (A) If indigent, will be provided with a court-appointed attorney to assist the parent or guardian in contesting the allegation; and
> (B) Shall have the right to perpetuate such person's testimony or that of any witness by means of depositions or interrogatories as provided by the Tennessee Rules of Civil Procedure; and

(5) If, by means of a signed waiver, the court determines that the incarcerated parent or guardian has voluntarily waived the right to participate in the hearing and contest the allegation, or if such parent or guardian takes no action after receiving notice of such rights, the court may proceed with such action without the parent's or guardian's participation.

Tenn. Code Ann. § 36-1-113(f)(1)-(5).

As noted above, Mr. Williams was not present for the first day of the hearing in this case. At that time, his attorney informed the court that she had been unable to locate Mr. Williams in the prison system because he had been transferred. She further informed the court that she could not properly represent Mr. Williams at the hearing because she had not communicated with him. The trial court, however, denied a continuance and the hearing proceeded. Because the procedural

requirements set forth in Tenn. Code Ann. § 36-1-113(f) were not followed, we find that the trial court erred by proceeding in Mr. Williams's absence.

In its brief, DCS acknowledges this error and requests that this case be remanded for rehearing. In his brief, Mr. Williams asks that we remand the case for rehearing only after first reviewing the record for substantive errors. We note that the procedural error in this case resulted from DCS opposing and the trial court denying the requested continuance when it became evident that Mr. Williams could not be produced for the trial. DCS was allowed to present its entire case in the trial court and was not prejudiced by Mr. Williams's absence. A remand would only serve to reward DCS for the error by providing it a second opportunity to present its evidence. This would be both unfair to Mr. Williams and wasteful of judicial resources. As explained in detail below, we have found that DCS failed to establish a ground for termination in the trial court. Consequently, remanding this matter for a second hearing is neither appropriate nor necessary.

### Termination of Parental Rights

A parent has a fundamental right to the care, custody, and control of his or her child. ***Stanley v. Illinois***, 405 U.S. 645, 651 (1972); ***Nash-Putnam v. McCloud***, 921 S.W.2d 170, 174 (Tenn.1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. ***Nash-Putnam***, 921 S.W.2d at 174-75 (citing ***Santosky v. Kramer***, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." ***In re W.B.***, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn.Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn.Code Ann. § 36-1-113(c); ***In re D.L.B.***, 118 S.W.3d 360, 367 (Tenn.2003); ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn.2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. ***Santosky***, 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn.Code Ann. § 36-3-113(c)(1); ***In re Valentine***, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable ... and eliminates any serious or substantial doubt about correctness of the conclusions drawn from the evidence." ***In re M.J.B.***, 140 S.W.3d 643, 653 (Tenn.Ct.App.2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." ***Id***. at 653.

In light of the heightened standard of proof in termination cases, a reviewing court must modify the customary standard of review set forth in Tenn. R. App. P. 13(d). As to the trial court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as

found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Id*; *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

The trial court terminated Mr. Williams's parental rights to M.L.E.S. on three of the statutory grounds: abandonment under Tenn.Code Ann. § 36-1-113(g)(1); failure to manifest an ability and willingness to assume legal and physical custody of the child under Tenn.Code Ann. § 36-1-113(9)(A)(iv); and failure to establish paternity of the child under Tenn.Code Ann. § 36-1-113(9)(A)(vi). We will review the record to determine if DCS established at least one of these grounds for termination by clear and convincing evidence.

## Abandonment

Tenn.Code Ann. § 36-1-113(g)(1) states that termination may be based on "abandonment by the parent or guardian, as defined in § 36-1-102...." Section 36-1-102 states, in pertinent part:

> (1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> (i)For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child.

Tenn. Code Ann. §§ 36-1-102(1)(A)(i).

Under Tenn. Code Ann. § 36-1-102(1)(A)(i), the court may only consider the parent's conduct in the four months immediately preceding the filing of the petition then before the court. *In re D.L.B.*, 118 S.W.3d 360, 366 (Tenn. 2003). Here, the trial court found that Mr. Williams willfully failed to support the child "despite being able-bodied and capable of being employed." Mr. Williams, however, was incarcerated throughout the four months preceding the filing of the termination petition. Despite his incarceration, Mr. Williams testified that he would send money to his father whenever his father informed Mr. Williams that M.L.E.S. needed something. Moreover, Mr. Williams testified that, whenever Ms. Goodlow told him that M.L.E.S. needed clothing or things of this nature, he would make arrangements to get the money to Ms. Goodlow through his family. The fact that Mr. Williams was unable to produce receipts for these expenditures does not negate his testimony. From our review of the record, DCS has not clearly and convincingly rebutted Mr. Williams's testimony that he did provide for M.L.E.S. as he was able. From the totality of the

circumstances, we conclude that the ground of abandonment by willful failure to support is not supported by the evidence in the record.

> Tenn. Code Ann. § 36-1-102(1)(A)(iv) defines "abandonment" as follows:
>> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv). This definition, which applies to incarcerated parents, encompasses two distinct tests for abandonment. *In re Audrey S.*, 182 S.W.3d 838, 865 (Tenn. Ct. App. 2005). Under the first test, the court must look to the time period four months prior to the parent's incarceration. *Id*. at 865. In the present case, however, the trial court only considered Mr. Williams's behavior in the four months preceding the filing of the termination petition. Tenn. Code Ann. § 36-1-102(1)(A)(iv) contains a second test which asks whether "the parent has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." *Id*. Unlike the first test, this question "is not expressly limited to any four month period. *Audrey S.*, 182 S.W.3d at 865. DCS, however, failed to offer proof showing that Mr. Williams had exhibited a wanton disregard for M.L.E.S.'s welfare. Consequently, the trial court's finding of "abandonment" under Tenn. Code Ann. § 36-1-102(1)(A)(iv) was in error.

### Willingness to Assume Legal and Physical Custody

Tenn.Code Ann. § 36-1-113(9)(A) provides, in pertinent part:

> (9)(A) The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person or, if no such petition is filed, at the time of the filing of a petition to adopt a child, is not the legal parent or guardian of such child or who is described in § 36-1-117(b) or (c) may also be terminated based upon any one (1) or more of the following additional grounds:
> *                                    *                                    *

(iv) The person has failed to manifest an ability and willingness to assume legal and physical custody of the child;[3]

Because of his incarceration, Mr. Williams did not have the ability at the time of the hearing to assume legal and physical custody of the child. This fact, however, does not prove a lack of desire or willingness to do so. Here, the testimony indicates that, throughout his incarceration, Mr. Williams has called and written to M.L.E.S. when he has had the opportunity. Moreover, as discussed above, Mr. Williams has provided support to the child by the means available to him (i.e., his family). In short, the record does not clearly and convincingly support a finding that Mr. Williams has not expressed, through his words and actions, a willingness to parent this child. From the entire record, we conclude therefore that, despite Mr. Williams's lack of ability to support the child, he has expressed a willingness and desire to parent. Consequently, we find that this DCS failed to establish this ground for termination of his parental rights by clear and convincing evidence.

## Failure to Establish Paternity

Tenn.Code Ann. § 36-1-113(9)(A) also provides that the parental rights of a person who is not the legal or custodial parent may be terminated if that person "has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity by the child's mother, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(3)." Tenn. Code Ann. § 36-1-113(9)(A)(vi). As noted above, on or about March 22, 2006, Mr. Williams wrote to the court as follows:

> I, Marlow L. Williams, Sr., do hereby consent to being the biological father of [M.L.E.S.].... I want my rights to be reserved as her biological Father. I am willing to take any test, or whatever steps necessary to prove the fact....

This letter was followed by an affidavit of April 16, 2007, which indicates that Mr. Williams acknowledges M.L.E.S. to be his biological child. By Mr. Williams's testimony, it appears that the genetic test that is contained in this record was actually instigated by Mr. Williams or his father, and not by DCS. Despite Mr. Williams's letter indicating that he wishes to establish paternity of M.L.E.S., from the record, we conclude that DCS did not facilitate this process by informing Mr. Williams about the paternity process. This conclusion is supported by the testimony of Daphne Jason, the DCS Family Service Worker who testified that DCS had not had much contact with Mr. Williams. Mr. Williams's testimony also supports a finding that DCS was not actively involved in pursuing paternity:

---

[3] This ground for termination of parental rights is applicable to those who have not been adjudicated to be the legal parent or guardian of the child. Despite genetic testing proving his paternity, we find nothing in the record which adjudicates Mr. Williams to be M.L.E.S.'s legal parent. Therefore, we conclude that this statute does apply.

-9-

Q [to Mr. Williams]: Okay.  Now, let's talk about paternity for a minute.  Were you ever asked to participate in a DNA test?

A.  Well, I asked to have one taken.  Because they [DCS] told me because I had never proven myself to be [M.L.E.S.'s] father that, you know, they was [sic] more or less just going off a name.
 So I wanted to go ahead and go through the process of registering as her father, legitimizing her as my child, you know, me as the biological father.  You know, prior to all this, I had no–I had no knowledge of it.

Q.  You didn't know it was a process?

A.  No.  I didn't know it was a procedure that you had to go through to prove that the child was yours.  I thought that it was just proven by the fact that, you know, DNA proved that.

Q.  So you were requesting to have a DNA test done?

A.  Right.

Q.  Who did you make these requests to?

A.  To the Registry.  I filed a Registry form.

*                              *                              *

Q.  Okay.  Did you ever have any conversations with the Department of Children's Services about helping you get the DNA test done?

A.  It was more or less–I really never talked to anyone personally other than Ms. Daphne about that....

 But, you know, they was [sic] more or less telling me that I had to have it done, or that I had to go through the procedure to have the State or County, wherever I was at the time, to have it done.

Q.  Did [DCS] ever indicate to you that they would help you through those procedures?

A.  No.

Q.  Did you ever ask for help through those procedures?

A.  I was trying to get it done...

   I was asking whoever I could.  My father, he put forth the effort to have it done.  I believe he had one done where he paid for it himself.

In a recent decision, ***In re S.T.T.***, No. M2007-01609-COA-R3-PT, 2008 WL 162538 (Tenn. Ct. App. Jan. 17, 2008), the Court found that DCS has some responsibility to the biological father in establishing paternity pursuant to Tenn. Code Ann. § 36-1-113(g)(9)(A)(vi).  In ***S.T.T.***, DCS "led [the father] to believe that it was not necessary [for him to establish paternity] by identifying his relationship with the child as the 'Legal Father' in the Permanency Plan." ***Id***. at *8.  In the present case, Mr. Williams consented to a DNA test, had the test performed, and notified the court in writing that he wished to pursue his rights as the biological father of the child.  It appears, however, that not enough was done on DCS's part to aid Mr. Williams in this endeavor.  Like the Court in ***In re S.T.T.***, we find, under the unique facts of this case, that the record does not support the trial court's finding that Mr. Williams failed to establish paternity of this child pursuant to Tenn. Code Ann. § 36-1-113(g)(9)(A)(vi).

Having concluded that none of the grounds for termination of Mr. Williams's parental rights to M.L.E.S. are met by clear and convincing evidence in the record, we do not address whether termination of his rights is in the best interest of the child.

For the foregoing reasons, we reverse the order of the trial court insofar as it terminates the parental rights of Marlow Williams, to the minor child M.L.E.S.  The order is affirmed in all other respects.  Costs of this appeal are assessed against the Appellee, State of Tennessee Department of Children's Services, for which execution may issue if necessary.

_____

J. STEVEN STAFFORD, J.